DAN G. BOYLE (State Bar No. 332518)
BOIES SCHILLER FLEXNER LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 213-629-9040
Facsimile: 213-629-9022
Email: dboyle@bsfllp.com

MATTHEW L. SCHWARTZ (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Fl.
New York, NY 10001
Telephone: (212) 446-2300
Email: mlschwartz@bsfllp.com

*Counsel for Plaintiff*
*Dreamland Baby Co.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| DREAMLAND BABY CO.,<br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant* | Case No. 8:25-cv-01798-DFM<br><br>**AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**<br><br>Hon. Douglas F. McCormick |

## INTRODUCTION

Plaintiff Dreamland Baby Co. ("Dreamland" or the "Company") brings this action for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, against the United States of America based on the actions of the Consumer Product Safety Commission (the "CPSC" or the "Commission"), former CPSC Commissioner Richard Trumka, Jr ("Trumka," acting as Commissioner and the Commission itself), and other employees of the Commission.

In support, Plaintiff alleges the following:

1. Founded by a mother of four, Dreamland Baby Co. designs, manufactures, and sells weighted infant sleep products, which afford infants the sense of security and comfort they need to sleep soundly—and which, in turn, allows parents of infants to get the rest that they so need and deserve.

2. Until the actions that form the basis of this lawsuit, Dreamland was wildly successful, selling more than a million units worldwide and appearing (and accepting an offer) on the hit show *Shark Tank*. But now, as a result of the wrongful conduct of the CPSC—and in particular, former commissioner Richard Trumka, Jr. and employees assisting him—falsely suggesting that weighted infant sleep products such as Dreamland's are unsafe, and threatening major retailers into discontinuing sales, Dreamland finds itself in financial and reputational peril. The government, while acknowledging the deep problems with Trumka's actions, has refused to make things right. Dreamland is therefore forced to file this lawsuit.

3. On November 8, 2023, the Commission voted by a 3-1 margin *against* regulating or otherwise issuing safety standards for weighted infant sleep products, including those made by Dreamland. In doing so, multiple members of the Commission noted that the CPSC did not have data that would support promulgating any standards for these products absent significant further research. The idea of banning these products wasn't even considered.

4. Trumka—the Commission member who had sought to regulate these

products and the sole dissenting vote—was undeterred. Rather than following the law, the data, and basic principles of administrative fairness, Trumka elected to take matters into his own hands and began a public campaign to destroy Dreamland using the imprimatur of his position on the Commission, while blatantly disregarding the law, CPSC regulations, and other duties.

5. After seeing his attempts to ban Dreamland's products through conventional means fail before the Commission, Trumka began posting attacks on weighted infant sleep products such as Dreamland's on his official CPSC accounts. When that pressure campaign failed, he sent defamatory, injurious, and disparaging letters to retailers that sold Dreamland's products, unsubtly threatening them with investigations or regulatory consequences if they did not stop selling Dreamland's products.

6. Unfortunately, Trumka succeeded. Faced with the implied (but false) threat of regulatory scrutiny from Trumka and the CPSC, Dreamland's retail partners almost immediately broke off their agreements with the Company within days. Customers were understandably confused, and misinformation spread rapidly, with widespread rumors that Dreamland's products had been recalled—when the full Commission had in fact voted against even regulating these products (a lower standard than required for recalls)—because members of the public logically (but incorrectly) assumed that Dreamland's products had been pulled from sale due to a government directive. Dreamland's sales plummeted, and the Company was forced to dispose of inventory, lay off employees, and wind down avenues of its business. Dreamland's largest retail partner stopped selling Dreamland's weighted products and even began destroying Dreamland's inventory held at its warehouses, because these products had supposedly been declared "unsafe" by the CPSC—although in reality, they were not. The same retailer subsequently sent letters to its customers who had purchased Dreamland's products suggesting they seek refunds and (mistakenly) implying that the CPSC had in fact ordered a recall of Dreamland's

products.

7. Trumka's conduct was self-serving and aimed primarily at rehabilitating his public profile after earlier high-profile blunders that led to bipartisan backlash. For example, in January of 2023 Trumka stated—apparently with no prior authorization, and no factual basis—that gas stoves, an appliance found in roughly 40% of American homes, were a "hidden hazard" and that "[a]ny option is on the table. Products that can't be made safe can be banned." The backlash was swift and embarrassing, with bipartisan denunciation, including a statement from the White House that "President [Biden] does not support banning gas stoves—and the Consumer Product Safety Commission, which is independent, is not banning gas stoves." The CPSC's then-chairman, Alexander Hoehn-Saric, was forced to issue a statement clarifying that "I am not looking to ban gas stoves and the CPSC has no proceeding to do so." As industry observers noted, "Commissioner Trumka's future appears more in doubt than that of the gas stoves he sought to ban."

8. Seeking to rehabilitate his public image (and presumably future career prospects), Trumka restyled himself as the CPSC's supposed public advocate, signing various public declarations as "Your consumer advocate at the Consumer Product Safety Commission." He then used his office and position to do exactly what the law did not allow: regulate (*i.e.*, stop the sale of) consumer products after the CPSC had voted against doing so.

9. While Dreamland may never fully recover from what has occurred, this action seeks to repair some of these wrongs and correct the various untruths that Trumka and the CPSC have allowed to be told about Dreamland and its products.

**PARTIES**

10. Plaintiff Dreamland Baby Co. is a California corporation headquartered in Newport Beach, California. Dreamland designs, develops, produces, and sells products for infants and children, including weighted sleepwear and swaddles.

11. Defendant United States of America (the "United States") is the federal

government of the United States of America and is the proper defendant pursuant to 28 U.S.C. §§ 2679(b)(1) and 1346(b)(1), and 15 U.S.C. § 2053(i).

12. The claims asserted herein against the United States arise out of acts and/or omissions of the CPSC (through Trumka) and/or officials, officers, agents, and/or other employees of the CPSC, including, but not limited to, former CPSC Commissioner Richard Trumka, Jr., who acted as both an employee of the Commission and the Commission itself.

13. The CPSC an independent regulatory commission of the United States and an "agency" under 5 U.S.C. § 551 (1). The CPSC is headquartered in Bethesda, Maryland.

## JURISDICTION, VENUE, AND EXHAUSTION

14. This Court has jurisdiction over this action pursuant 28 U.S.C. § 1346(b)(1) and the Federal Tort Claims Act. 28 U.S.C. §§ 2671–2680.

15. Venue in this district is proper under 28 U.S.C. § 1391(e)(1)(C) and 28 U.S.C. § 1402(a), as Dreamland is a resident of this Judicial District and its principal place of business is in this District.

16. This matter is timely filed. On September 14, 2024, Dreamland served a Claim for Damage, Injury, or Death on the CPSC. Counsel for the CPSC confirmed receipt of Dreamland's Claim on or about September 30, 2024.

17. As of the date of this filing, the CPSC has not responded to Dreamland's claim. Because the CPSC has failed to make a final decision within six months of Dreamland's claim being served, it is deemed denied. Accordingly, Dreamland has exhausted its administrative remedies for purposes of these claims against the United States under the Federal Tort Claims Act.

## STATUTORY AND REGULATORY BACKGROUND

18. In 1972, Congress enacted the Consumer Product Safety Act, Pub. L. No. 92–573, as amended (the "CPSA" or the "Act"), in response to concerns that "consumer products which present unreasonable risks of injury" were available to

consumers and that the then-existing regulatory frameworks were either "inadequate" or potentially "burdensome to manufacturers." 15 U.S.C. §§ 2051(a)(1), (4), (5).

19. Under the CPSA, the Commission is charged with (1) "protect[ing] the public against unreasonable risks of injury associated with consumer products;" (2) "assist[ing] consumers in evaluating the comparative safety of consumer products;" (3) "develop[ing] uniform safety standards for consumer products and to minimize conflicting State and local regulations;" and (4) promot[ing] research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." 15 U.S.C. § 2051(b).

20. The Act provides a general regulatory framework for many consumer products and authorizes the Commission to fulfill its mission in several ways, including: collecting, maintaining, and analyzing incident data; conducting product safety research, investigations, and product testing; assisting with the development of voluntary product safety standards; promulgating consumer product safety standards; addressing imminently hazardous products; and banning hazardous products. *See generally* 15 U.S.C. §§ 2054, 2056, 2058, 2061, 2064.

21. The Commission is authorized to promulgate consumer product safety standards that include establishing performance or warning requirements for consumer products. *See* 15 U.S.C. § 2056(a). The CPSA also permits the Commission to ban hazardous products which present "an unreasonable risk of injury." 15 U.S.C. § 2057.

22. In promulgating standards—or in banning hazardous products—the Commission must follow the procedures set forth by both the CPSA and the Administrative Procedure Act ("APA"). The information the Commission relies on, and discloses, is further subject to the Information Quality Act ("IQA"), 2 Pub. L. 106–554, § 515, and information quality guidelines issued by the Commission and the Office of Management and Budget.

23. Under the CPSA, "[t]he Commission must refrain from issuing a safety

standard if: (i) compliance with the voluntary standard 'would eliminate or adequately reduce the risk of injury addressed'; and (ii) it is likely that the industry will substantially comply with the voluntary standard." *Id.* (quoting 15 U.S.C. § 2056(b)(1)). Additionally, safety standard requirements "shall be reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product." 15 U.S.C. § 2056(a).

24. When it is permitted to promulgate a rule, and chooses to do so, the Commission must make several determinations supported by sufficient evidence and data. For example, the CPSC must "express in the rule itself the risk of injury which the standard is designed to eliminate or reduce." 15 U.S.C. § 2058(e). In doing so, the Commission must "consider relevant available product data including the results of research, development, testing, and investigation activities conducted generally and pursuant to [the CPSA]." 15 U.S.C. § 2058(e).

25. By way of example, since the late 1980s, the Commission has banned certain children's toys as unreasonably hazardous, including lawn darts and other similar sharp-pointed toys usually intended for outdoor use and having the potential for causing puncture wound injury. The Commission's rule setting out the ban, which was subject to notice and comment before becoming final, sets out the rule's purpose, the Commission's findings, the degree and nature of the risk addressed by the rule, countervailing considerations, and potential alternatives to a ban. *See* 16 C.F.R. pt. 1306.

26. In addition to governing how the CPSC regulates consumer products, the CPSA also limits how the Commission, individual Commissioners, and staff may discuss consumer products. 15 U.S.C. § 2055.

27. Section 6(b), 15 U.S.C. § 2055(b), places disclosure restrictions on the CPSC and "applies to *any information* from which the public can readily ascertain the identity of a manufacturer or private labeler of a consumer product." CPSC, *CPSA Section 6(b) FACT SHEET* (emphasis in original). The Commission must "take

reasonable steps to assure" that before it publicly discloses information that identifies a manufacturer or private labeler that such information "is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of [the CPSA]." 15 U.S.C. § 2055(b)(1). Moreover, the CPSA requires notice *before* such statements are made and an opportunity for a company to respond *before* the information is made public. 15 U.S.C. § 2055(b)(1).

28. Section 6(b) also requires the Commission to "establish procedures" that are "designed to ensure that" the information it discloses "reflects on the safety of a consumer product or class of consumer products, whether or not such information would enable the public to ascertain readily the identity of a manufacturer or private labeler, … is accurate and not misleading." 15 U.S.C. § 2055(b)(6). Those procedures are included in 16 C.F.R. pt. 1101.

29. Among those procedures, the Commission has determined that Section 6(b)(1)'s "notice and analysis provisions" apply if the information being disclosed (1) "pertain[s] to a specific product which is either designated or described in a manner which permits its identity to be ascertained readily by the public"; (2) is "obtained, generated or received by the Commission as an entity or by individual members, employees, agents, contractors or representatives of the Commission acting in their official capacities"; (3) "[t]he Commission or its members, employees, agents or representatives" proposes to publicly release the information; and, (4) "[t]he manner in which the product is designated or described in the information must permit the public to ascertain readily the identity of the manufacturer or private labeler." 16 C.F.R. § 1101.11.

30. The Commission has determined that the public is able to readily ascertain the identity of a manufacturer or private labeler "when a reasonable person receiving the information in the form in which it is to be disclosed and lacking specialized expertise can readily ascertain from the information itself the identity of the manufacturer or private labeler of a particular product." 16 C.F.R. § 1101.13.

31. The Commission is also required to assure that the information it releases is accurate. 15 U.S.C. § 2055(b)(1), (7). The Commission considers certain actions as sufficiently reasonable steps which assure the accuracy of information, including when "Commission staff or a qualified person or entity outside the Commission … conducts an investigation or an inspection" or "Commission staff conducts a technical, scientific, or other evaluation" corroborating the information being disclosed. 16 C.F.R. § 1101.32.

32. Before publicly disclosing any information that readily identifies a manufacturer, CPSC must take reasonable steps to assure the information's release is "fair in the circumstances." 15 U.S.C. § 2055(b)(1). The CPSC has determined that certain steps are reasonable to take to assure fairness, including providing the "manufacturer's or private labeler's comments" along with the public disclosure or "accompany[ing] the disclosure of information with an explanatory statement … [and] to disclose any other relevant information in its possession" or "limit[ing] the form of disclosure" or "delay[ing] disclosure[.]" 16 C.F.R. § 1101.33.

33. In order to implement these laws and regulations, the CPSC has established internal protocols—outlined in Directive 1450.2—for reviewing and approving public communications that address product safety. These procedures are designed to prevent the dissemination of inaccurate or misleading information. Directive 1450.2 applies to both oral and written disclosures and applies "Commission-wide" (including all employees, agents, and representatives) to any release of information from the Commission, including information disseminated on the CPSC's website, *regardless* of whether the information disclosed would enable the public to ascertain readily the identity of a manufacturer or private labeler.

34. Under Directive 1450.2, any public-facing statement issued from the Commission must undergo formal review and receive written authorization from designated staff. For statements involving technical or scientific claims, the directive requires that the content be substantiated by at least one of the following:

a. Data maintained in CPSC's official records or published in relevant scientific literature;

b. A documented expert assessment that reflects a thorough evaluation of all pertinent factors; or

c. A contractor-generated report that has been reviewed and approved by CPSC personnel.

35. In 1976, Congress passed the Consumer Product Safety Commission Improvements Act of 1976 (the "Improvements Act"). Among other things, the Improvements Act amended the Federal Tort Claims Act to authorize civil actions against the United States based upon any misrepresentation or deceit on the part of the Commission (defined as including its Commissioners (*see* 15 U.S.C. § 2053(a)) or any employee thereof, or any exercise or performance, or failure to exercise or perform, a discretionary function on the part of the Commission, or an employee thereof, which was grossly negligent. 15 U.S.C. § 2053(i).

## FACTUAL ALLEGATIONS

### A. Dreamland Designs, Develops, Produces, and Sells Weighted Infant Sleep Products

36. Dreamland designs, develops, produces, and sells weighted sleepwear and swaddles for infants and children, as well as a range of other infant and child sleep products and apparel.

37. Dreamland was founded by Tara Williams, who is the Company's current CEO.

38. Born from necessity when one of Tara's children wouldn't sleep through the night, Dreamland's weighted sleep products are intended to ensure that both infants and their grown-ups are able to get a decent night's sleep.

39. While the vast majority of parents are familiar with the weeks and months of lost sleep with a newborn or infant, the effects of this sleep deprivation are far more than an inconvenience:

a. In a survey of 692 mothers, 34% reported an infant sleep problem, and mothers reporting infant sleep problems had poorer mental and physical health compared with those not reporting sleep problems.[1] Researchers have similarly found that improving an infant's sleep leads to improvements in maternal depression scores.[2]

b. Research has shown that sleep deprivation and fatigue in new parents is associated with negative parenting and burnout, which in turn is associated with increased incidence of child abuse and so-called shaken baby incidents;[3]

c. According to the U.S. Centers for Disease Control and Prevention, being awake for 17 hours is similar to having a blood alcohol concentration (BAC) of 0.05% (the level some countries use for drunk driving violations), and being awake for 24 hours is similar to having a BAC of 0.10%—above the U.S. drunk driving level of 0.08.

d. Insufficient sleep during the early postpartum period has been associated with accelerated maternal biological aging[4].

e. Postpartum sleep deprivation has even been associated with reduced economic outcomes, particularly for lower-income or single-parent families that suffer greater impacts when one or both parents cannot

---

[1] Jordana K. Bayer et al., "Sleep Problems in Young Infants and Maternal Mental and Physical Health," 43 J. Paediatr. Child Health 66 (2007).

[2] Montgomery-Downs, H. E., Stremler, R., & Insana, S. P., "Postpartum Sleep in New Mothers and Fathers," 6 Open Sleep Journal, 6(1), p. 87–97).

[3] Maureen E McQuillan, et al., "Maternal Stress, Sleep, and Parenting," (J. Fam Psychol. 2019 Feb 14;33(3):349), https://tinyurl.com/2s4ycz6s; Moïra Mikolajczak, et al., "Consequences of Parental Burnout: Its Specific Effect on Child Neglect and Violence," (Child Abuse & Neglect, Vol. 80, June 2018, P.134), https://www.sciencedirect.com/science/article/abs/pii/S0145213418301297.

[4] Judith E. Carroll, et al., "Postpartum Sleep Loss and Accelerated Epigenetic Aging," (Sleep Health, June 2021, P. 362), https://www.sciencedirect.com/science/article/abs/pii/S2352721821000103.

rejoin the labor force as effectively.[5]

40. In 2019, Tara developed an idea for Dreamland's first product when her infant son had difficulty falling and remaining asleep without being held. After searching for a product that simulated the feeling of gentle embrace and failing to find anything suitable, Tara was determined to develop one. Through trial and error, she developed a lightly-weighted sleep sack that gently mimicked the feeling of a soothing touch on her son.

41. Tara then worked with her mother-in-law, a trained seamstress, to manufacture a prototype. She tested the prototype with her own son and was amazed by how quickly he settled in to sleep, and that he slept better and longer.

42. Tara then shared her prototypes with friends and family and asked them to complete surveys of their experience with the product.

43. After receiving positive feedback, Tara launched a Kickstarter campaign. This campaign was highly successful, and her products received rave reviews from parents whose infants and children were able to sleep through the night in Dreamland's products.

44. After the successful Kickstarter campaign, Ms. Williams expanded Dreamland's audience when her weighted sleep products were featured on ABC's *Shark Tank*—where Tara accepted an offer to invest from "Shark" Lori Greiner.

45. Since then, Dreamland has sold over one million of its weighted sleep products to families across the United States and internationally.

46. Currently, Dreamland sells three wearable weighted sleep products: a swaddle, a sleep sack, and a transition swaddle. All three products feature a quilted fabric design that allows weight to be evenly distributed throughout the product.

---

[5] Jeremy Clark & David L. Dickinson, "The Impact of Sleep Restriction on Contributions and Punishment: First Evidence" (Inst. for Lab. Econ., IZA Discussion Paper No. 10823, 2017), https://ideas.repec.org/p/cbt/econwp/17-02.html.

These products are filled with non-toxic, hypoallergenic, smooth, non-porous poly pellet beads.

47. Dreamland does not have retail stores and instead has largely operated by sales through retail merchant partners. These partners have included online merchants such as Amazon and BabyList, as well as brick-and-mortar chains with an online presence, such as Target and Nordstrom. While Dreamland does sell direct-to-consumer, until the events described herein, the majority of Dreamland's sales occurred through these retail partners.

48. Dreamland's products are totally safe. According to Dr. Richard H. Sandler, a Pediatric gastroenterologist at Nemours Children's Hospital and Adjunct Professor of Pediatrics and Mechanical and Aerospace Engineering at the University of Central Florida, the gentle pressure provided by one of Dreamland's weighted sleep sacks is comparable to placing a slice of bread on an infant's chest while sleeping. Another Board-Certified Pediatrician and co-author of a widely-read infant sleep book has stated that "There is no clear clinical evidence against the use of weighted sleepwear products, and I will continue recommending them as I've found them to be a valuable and safe sleep aid for my patients."

49. Dreamland also donates its weighted sleep products to neonatal intensive care units across the United States for research purposes, where they are used under the supervision of medical staff to soothe and comfort babies born with Neonatal Abstinence Syndrome, a condition where a newborn baby withdraws from drugs they were exposed to in the womb, largely in response to the ongoing nationwide opioid epidemic.

**B. Trumka's Attempts to Regulate Weighted Infant Sleep Products Are Rejected by the Commission**

50. On November 8, 2023, the Commission convened a meeting to consider its Fiscal Year 2024 Operating Plan, and to discuss, among other things, proposed amendments for the CPSC's business for the upcoming year.

51. For consideration at this meeting, Trumka proposed an amendment for the CPSC's FY2024 plan (the "Trumka Amendment").

52. The Trumka Amendment would have required the CPSC to "pursue a mandatory standard to address foreseeable risks posed by" weighted infant sleep products such as Dreamland's.

53. The Trumka Amendment also would have required the CPSC to "update all safe sleep messaging and guidance to incorporate recent advice on weighted infant sleep products from the Centers for Disease Control and Prevention and from the National Institutes of Health."

54. In support, Trumka claimed that he was relying on statements by the National Institute of Health ("NIH") and Centers for Disease Control and Prevention ("CDC") cautioning against the use of weighted infant sleep products. At that time, however, Trumka knew that neither the NIH nor CDC was authorized to make product safety determinations and was aware that neither agency had actually conducted any research regarding the use of weighted infant sleep products or independently verified any third-party recommendations.

55. Rather, as Trumka also knew, both of these agencies had simply repeated non-binding guidance from the American Academy of Pediatrics ("AAP"). In June of 2022, the AAP had updated its safe sleep guidelines to recommend against the use of weighted infant sleep products. As the AAP has acknowledged, however, its recommendation was based largely on 'hypothesized' safety concerns, along with the belief that weighted sleep products are "unnecessary" — apparently not concerned about the effects of sleep deprivation on new parents—and thus adopted a 'better-safe-than-sorry' approach that treated such products as potentially unsafe without any data otherwise.

56. In fact, in a document laying out the "Evidence Base" for its recommendations, the AAP acknowledged that "no studies have documented the safety of weights for infants in an unobserved, nonclinical sleep environment," and

that its recommendation was based entirely on "[a] single crossover randomized nonblinded trial of 16 infants with neonatal abstinence syndrome." That study "found no adverse events when a 1-pound weighted blanket was placed on each infant for 30 minute observed episodes." In other words, the evidence cited by the AAP confirmed that in the only study of weighted sleep products for infants, no infant was harmed or endangered, and that there was no evidence to the contrary.

57. As economist Emily Oster observed at the time the revised guidelines were released, the paper AAP cited "is evidence of *safety*" and that "[t]here is no data cited suggesting danger." Emily Oster, *New AAP Guidelines on Breastfeeding and Safe Sleep*, ParentData (July 5, 2022) (emphasis in original). She continued that "[her] sense, reading between the lines, is that the AAP is reacting to a lack of wide-scale direct evidence that these products are safe, combined with a theoretical concern that heavy blankets could imperil breathing. It chose to discuss these issues at this time because the products are becoming more popular." *Id.*

58. The other members of the Commission rejected the Trumka Amendment by a vote of 3-to-1, with Trumka being the sole vote in favor. (One seat was vacant at the time.)

59. Unsurprisingly, multiple members of the Commission noted the exact absence of data about weighted infant sleep products identified above. For example, Commission Chair Alexander Hoehn-Saric observed that it was "[his] understanding that [CPSC] staff has not conducted the research necessary to draft a notice of proposed rulemaking in 2024[,]" and that "simply directing [the staff] to do it or wishing something to happen doesn't reflect the work that has to go into a successful rulemaking that ultimately reflects the science and can be sustained over time." Similarly, in her remarks, Commissioner Mary T. Boyle noted that a rulemaking was "at this time premature." In sum, the rest of the Commissioners recognized that—unlike the AAP's non-binding guidance—the CPSC could not regulate consumer products without actual data indicative of harm.

60. Accordingly, the Trumka Amendment was never adopted.

61. After his amendment failed, Trumka released a statement calling weighted infant blankets "glaring," "concerning," and "alarming" hazards and claiming—despite the lack of any underlying data—that such products were "deemed dangerous by NIH, CDC, and the American Academy of Pediatrics." Trumka Statement, *CPSC Operating Plan Fails to Address Glaring Safety Concerns: Commissioner Trumka Forced to Vote "No"* (Nov. 8, 2023). Trumka's statement also attacked his fellow Commissioners for not supporting his amendment, accusing them of failing to "act faster and more boldly."

### C. Trumka Takes Matters into His Own Hands and Begins Publicly Attacking Weighted Infant Sleep Products and Dreamland

62. After the Trumka Amendment failed, Trumka formulated and executed a scheme to engineer the same intended result—stopping the sale of all weighted infant sleep products, including Dreamland's—by using illegal means, instead of following the laws and regulations that guide the CPSC's activity.

63. Trumka was fully aware that his public comments as a Commissioner of could garner enormous publicity. Indeed, that was one of his goals.

64. As the most prominent example, in October of 2022, Trumka had pushed for stricter regulation of gas stoves, but much like with the Trumka Amendment, his proposal to pursue rulemaking regarding gas stoves was rejected by the other Commissioners and was never adopted.

65. Undeterred, Trumka then went to the press, and in an interview with Bloomberg in January 2023, claimed that gas stoves were "a hidden hazard" and asserted that "any option is on the table. Products that can't be made safe can be banned." Trumka made these statements despite knowing that they were false.

66. Nonetheless, Trumka's statements caused widespread confusion and public outcry, which reached the point where, *inter alia*, the White House was forced to issue a statement clarifying that "President [Biden] does not support banning gas

stoves—and the Consumer Product Safety Commission, which is independent, is not banning gas stoves." The CPSC's then-Chair, Mr. Hoehn-Saric, similarly issued a statement clarifying that "I am not looking to ban gas stoves and the CPSC has no proceeding to do so."

67. Other than public rebukes, however, Trumka was not otherwise sanctioned or disciplined for attempting to circumvent the formal and lawful rulemaking process.

68. When the Trumka Amendment failed before the Commission as a whole, Trumka again tried to unilaterally accomplish through his bully pulpit what he could not accomplish through formal rulemaking or other legitimate means: banning weighted infant sleep products such as Dreamland's. This time, instead of implying that the Commission might adopt a rule banning the products—which, as with gas stoves, could be easily denied by his fellow Commissioners—Trumka chose to intimidate retailers into ceasing sales of these products. This was in effect, a ban by other means.

69. To this end, and despite the Chair's admission that the CPSC lacked the data to regulate weighted infant sleep products, Trumka issued a series of misleading and highly damaging statements, letters, videos, and posts on X.com (formerly Twitter) and Instagram from his official CPSC accounts maligning weighted infant sleep products such as Dreamland's.

70. For example, on January 26, 2024, Trumka announced from his X.com account (@TrumkaCPSC) that the CPSC, along with other government agencies and the AAP, were "all in agreement when it comes to weighted infant sleep products: they pose serious threats to the lives of babies. Do NOT use them for sleep." @TrumkaCPSC, X.com (Jan. 26, 2023 at 12:00 PM):



Commissioner Rich Trumka Jr. @TrumkaCPSC · Jan 26

The @CDCgov, @NIH, @AmerAcadPeds and @USCPSC are all in agreement when it comes to weighted infant sleep products: they pose serious threats to the lives of babies. Do NOT use them for sleep.

More from @washingtonpost: washingtonpost.com/wellness/2024/...

The Washington Post
Democracy Dies in Darkness

CONSUMER REPORTS

Weighted blankets are dangerous for babies, doctors warn

One such weighted product was linked to at least one infant death, regulators say

By Lauren Kirchner
January 22, 2024 at 2:00 p.m. EST

The American Academy of Pediatrics said in a letter that weighted blankets should never be used for babies. (iStock)

413

71. This post included a link to an article that specifically identified Dreamland and its products. *See* Lauren Kirchner, *Consumer Reports, weighted blankets are dangerous for babies, doctors warn*, WASH. POST (Jan. 22, 2024, at 2:00 p.m. EST). Trumka was therefore aware of and willfully targeted Dreamland.

72. Dreamland was never provided with advance notice of these statements nor the opportunity to respond.

73. On information and belief, Trumka acted with the assistance of other CPSC employees when making these posts, including but not limited to communication and press staffers, policy staffers, secretarial staff, IT staff, legal staff,

and/or compliance staff (collectively, the "CPSC Staff").[6]

**D. The Commission and the CPSC Staff Cause Changes to the CPSC's Website That Have No Basis in Fact**

74. The Trumka Amendment would have required CPSC to update its safe sleep messaging and guidance to match that of the NIH and CDC, but the full Commission rejected this course of action in voting down the Trumka Amendment. At the same time, Chair Hoehn-Saric noted that CPSC staff had not conducted the research necessary to draft a notice of proposed rulemaking in 2024, and that they were working to "assess and quantify the safety risks associated with weighted blankets."

75. Nonetheless, at some time after November 8, 2023, the CPSC's Safe Sleep Guidance webpage was updated without public notice to add the language: "**Don't** use weighted blankets or weighted swaddles*. … *NIH.gov and CDC.gov." CPSC, *Safe Sleep - Cribs and Infant Products* (emphasis in original).[7]

76. Based on the clearance vote sheet underlying this statement, multiple individuals contributed to ordering this statement to be made, drafting the statement, sending it through the CPSC's internal clearance process, approving it, and publishing it online. On information and belief, this change was directed by Trumka and high-ranking members of the CSPSC Staff and caused by other CPSC employees, including the CPSC Staff.

77. Furthermore, because the Safe to Sleep campaign is a collaborative initiative involving CPSC and other entities, any statements made through that

---

[6] Discovery will reveal the identities of the CPSC Staff. To date, Dreamland has identified three individuals: Robin Lipp, Isabella Maxey, and Kaiwon Tresvant.

[7] Sometime after July 23, 2024, the footnote associated with this "*" was edited to say "This guidance is based on information from the Centers for Disease Control and the National Institutes for Health. Please go to CDC.gov and NIH.gov for more information." *Id.* (last visited Aug. 11, 2025).

campaign qualify as "Joint Projects" under Directive 1450.2. As such, they are subject to the same clearance standards. There is no evidence that the NIH or CDC's statements—as republished on the CPSC's website—were reviewed or approved in accordance with Directive 1450.2.

78. As Trumka was aware, Dreamland was at that time working with the American Society for Testing and Materials ("ASTM") and other industry members to develop voluntary safety standards for wearable blankets and swaddles that would cover Dreamland's products.

79. In February 2026, in fact, ASTM published voluntary safety standards for wearable sleep products such as Dreamland's weighted infant sleep products, thus repudiating any suggestion that these products are inherently dangerous or unsafe. This consensus safety standard was reached by experts and industry participants and was only possible after Trumka was terminated from the Commission in 2025.

80. Trumka was similarly aware the Dreamland was one of the primary manufacturers of weighted infant sleep products, as Dreamland and its representatives had direct engagement with the Commission about these products — including meetings with Chair Hoehn-Saric and Commissioner Boyle during the November 2023 to April 2024 timeframe.

81. Dreamland formally requested a meeting with Trumka about its products during this time period, but Trumka did not respond to Dreamland's request.

### E. Trumka Engineers a Shadow Ban of Dreamland's Products Without Any Vote or Action by the Full Commission

82. Trumka did not limit himself to posting false statements implying that the CPSC had found weighted infant sleep products to be unsafe.

83. On April 15, 2024, Trumka posted a statement on the official CPSC website, with an accompanying statement on CPSC letterhead, and a video statement on his official X.com and Instagram accounts, stating that weighted infant sleep products were "unsafe" and encouraging retailers to stop selling such products. *See*

Comm'r Trumka, *Beware: Weighted Infant Swaddles and Blankets Are Unsafe for Sleep; Retailers Should Consider Stopping Sales* (Apr. 15, 2024).

84. In these public statements he made several inaccurate, misleading, and/or unsubstantiated claims including the entirely unfounded assertion that using weighted infant sleep products leads to "a risk of death" for infants. *See*, *e.g.*, @TrumkaCPSC, X.com (Apr. 15, 2024, at 3:16 PM).

85. Among other things, the videos he posted included an image of a swaddled infant with two dumbbells crisscrossed over the child's chest and superimposed with a general prohibition sign over the image. This image was obviously meant to invoke an infant's chest being crushed, and any layperson viewing this image would assume that weight on an infant's chest from these products must be extremely heavy. In small, barely legible writing, the image stated: "Weights and baby not shown to scale. For illustrative purposes only." *See*, *e.g.*, @TrumkaCPSC, X.com (Apr. 15, 2024, at 3:16 PM):




86. On information and belief, this misleading dumbbell graphic was created by the CPSC Staff and edited into the video Trumka and/or the CPSC Staff posted.

87. In his April 15th statement, Trumka was clear about his intention to circumvent the lawful rulemaking process, stating "Last fall, I tried to amend CPSC's operating plan to start work on a rule to protect babies from weighted products, but was unable to garner the necessary support at that time. [. . . .] But we do not have to wait for a federal rule…"

88. On or about the same day, Trumka and the CPSC Staff sent letters to multiple retailers of Dreamland's weighted infant sleep products, including Target, Walmart, Nordstrom, and Babylist, seeking to pressure them into stopping sales of weighted infant sleep products (collectively, the "Trumka Letters"). *See, e.g.,* Ex. A (Apr. 15, 2024 Letter from Trumka to Target Corporation).

89. The Trumka Letters were written on Trumka's official CPSC letterhead, identifying its headquarters in Bethesda Maryland. On information and belief, the Trumka Letters were drafted and dispatched by the CPSC Staff from the same location.

90. The Trumka Letters each included a hyperlink to a product search for weighted infant sleep products, which specifically identified Dreamland's products as searchable and for sale on each retailer's website at that time. The Trumka Letters also linked to articles that expressly named Dreamland and its products.

91. On information and belief, Trumka was aware of Dreamland and knew and intended that readers of the Trumka Letters would identify Dreamland's products in order to halt sales of such products, just as the Trumka Letters requested.

92. The Trumka Letters were false and misleading in multiple respects, including:

a. The Trumka Letters stated that Trumka was "aware of **multiple infant deaths** involving weighted infant sleep sacks" (emphasis in original);

b. The Trumka Letters suggested a causal link between weighted infant sleep products such as Dreamland's and Sudden Infant Death Syndrome (SIDS); and

c. The Trumka Letters stated that weighted infant sleep products posed "serious safety concerns" and that there was a "consensus among public health agencies, pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are

not safe for infant sleep."

93. The Trumka Letters included an unsubtle threat to the retailers to cease sales of weighted infant sleep products such as Dreamland's or face regulatory scrutiny, stating: "Considering these serious safety concerns, I would like to speak with a representative of your company to discuss a simple question: does [the retailer] really want to continue selling these products to its consumers? Your consumers place a great deal of trust in your hands." The Trumka Letters then directed each retailer to contact Trumka's office to schedule meetings about these products.

94. Trumka had no statutory or regulatory authority to compel any retailers to sit for an inquiry or otherwise appear before him. Nonetheless, at least one of these retailers interpreted the Trumka Letters as an official demand that compelled a response. CPSC records from this period show multiple calls following the Trumka Letters in April of 2024 between Trumka's office and retailers, for example, noting discussions regarding a "timeline in which Target can *officially respond* to Commissioner Trumka's letter regarding weighted infant products." (emphasis added).

95. The Trumka Letters did not disclose that the rest of the Commissioners had previously voted against regulating these products, or that the only cited research was by a non-governmental agency, which showed no evidence of harm or pattern of hazard.

96. At the time he sent the Trumka Letters, Trumka was aware that the CPSC had made no findings as to the safety of weighted infant sleep products such as Dreamland's. Trumka also knew or should have known that neither the NIH nor CDC had conducted any independent research into weighted infant sleep products, that the AAP's recommendation was not based on any data showing that weighted infant sleep products were actually hazardous, and that the single study cited by the AAP actually found "no adverse events" from the use of weighted infant sleep products.

97. Trumka also claimed in the Trumka Letters that the CPSC had issued a public warning about weighted infant sleep products such as Dreamland's, but as detailed above, this also was false and misleading. The only "warning" issued by the CPSC was the product of Trumka and the CPSC Staff causing the CPSC's website to be changed to reflect Trumka's agenda, contrary to the full Commission's vote.

98. Trumka was therefore aware that his statements were false or, at least, could not have cared less about their falsity, given that he wanted to rebuild his tarnished image by rebranding himself a "consumer advocate" champion. Lacking nuance, Trumka decided to portray himself a savior of babies and, conversely, portray Dreamland and other manufacturers of weighted infant sleep products as villains endangering babies.

99. Trumka therefore acted with malice. Targeting Dreamland and other weighted infant sleep products was not merely incidental to his plan. Rather, it was necessary to achieve his Manichean messaging to the public: Trumka and the CPSC Staff were aware that this conduct would harm Dreamland's sales, business, and reputation, but proceeded anyway, intending that harm or, at least, with conscious disregarding for it.

100. Despite the links in Trumka's Letters leading to its products, Dreamland was provided no notice of any of Trumka's statements in the Trumka Letters before they were made, even though the statements allowed the public to readily ascertain Dreamland's identity, which Trumka intended because Dreamland was among the leading manufacturer of weighted infant sleep products.

101. On information and belief, Trumka and the CPSC Staff sent similar letters to other retailers.

102. None of Trumka's statements, including the Trumka Letters, claimed that these statements and communications were solely his views made in his official capacity, or that they were not representative of the Commission as a whole.

103. Trumka's statements ended with his self-appointed title: "Your

consumer advocate at the Consumer Product Safety Commission."

104. Trumka was aware that his actions were illegal, as he had previously decried the statutory and regulatory requirements that the CPSC not identify and defame product manufacturers. For example, on February 8, 2023, Trumka issued a press release stating that "we need to think about how we can get the most information to consumers as quickly as possible. Where the Gag Rule [15 U.S.C. § 2055] stops us . . . so be it. But there is no room for us to *stop ourselves* from doing the right thing. We owe consumers more than that." (emphasis in original). On information and belief, Trumka acted with the help of other CPSC employees when making these posts and sending these letters, including but not limited to the CPSC Staff.

**F. Trumka Takes Credit for Stopping the Sale of Dreamland's Products**

105. Within days of the Trumka Letters, out of fear of being investigated or sanctioned by the CPSC, each and every one of Dreamland's retail partners that received one of the Trumka Letters halted sales of Dreamland's weighted infant sleep products. At least one of Dreamland's retail partners halted sales of all of Dreamland's products in response to the Trumka Letters, not just its weighted infant sleep products.

106. Trumka was aware that Dreamland's merchant partners were halting sales of weighted infant sleep products such as Dreamland's, and Trumka publicly acknowledged that this stop-sale was caused by his actions—indeed, he took credit for it.

107. On April 26, 2024, Trumka posted a statement on the CPSC's website stating "On April 15, 2024, I wrote to major U.S. retailers informing them of the hazards weighted infant swaddles and blankets pose to babies and asking them to consider whether they want to continue selling such products. I am pleased to announce that Target, Walmart, Nordstrom, and Babylist quickly responded by

sharing that they will cease sales of weighted infant products in the interest of safety." (the "April 26 Statement").

108. Much like the Trumka Letters, the April 26 Statement was false and misleading in multiple respects, including by stating:

a. "[M]ultiple infant deaths have occurred in weighted infant products";
b. "I've sat with the parents of a child who died in one of these products";
c. "[T]here is evidence that the use of weighted sleep products on infants can lead to lower oxygen levels, which if sustained, may be harmful to the developing infant's brain"; and
d. describing weighted infant sleep products such as Dreamland's as "hazard[ous]."

109. At all times, however, Trumka was aware that the CPSC had made no findings as to the safety of weighted infant sleep products such as Dreamland's.

110. The April 26 Statement did not disclose that the CPSC had voted against regulating these products, or that the only cited research was by a non-governmental agency which showed no evidence of harm.

111. The April 26 Statement also did not disclose that the "child who died in one of these products" referenced by Trumka died in an unsafe sleep environment of entirely separate causes, and that a medical investigation found that the weighted sleep product worn by the child was not the cause of the infant's tragic passing.

112. Trumka knew his statements were false or, for the same reasons as stated above, he at least acted with conscious disregard for their falsity.

113. The April 26 Statement also unsubtly threatened Dreamland's remaining merchant partners, describing those retailers who had stopped selling Dreamland's products as "deserv[ing] praise for prioritizing safety over profits" and "responsible stewards of public safety … focusing on their customers' best interests," and then identifying another major merchant partner, Amazon, stating that Trumka had

"observed other major companies like Amazon begin to follow their example … I expect to hear back from additional retailers soon."

114. Trumka again signed the April 26 Statement as "Your consumer advocate at the Consumer Product Safety Commission."

115. Dreamland did not receive any prior notice of the April 26 Statement.

116. Trumka then followed up with a post on X.com on the same day, again taking credit for Dreamland's merchant partners ceasing sales of its products, stating "After receiving my letters, @Target, @Nordstrom, @Walmart and @Babylist have agreed to discontinue the sale of weighted infant sleep sacks to keep babies safe! … This action could save lives, and I'm grateful for their cooperation."

117. Trumka repeated the same message taking credit for the shadow ban of Dreamland's products in a post on Instagram on the same day.

118. For the reasons stated above, Trumka acted with malice, intending to target Dreamland, knowing that Dreamland would be harmed, and disregarding that harm.

119. Following the April 26 Statement, more of Dreamland's retail partners, including some that had not received one of the Trumka Letters, halted sales of Dreamland's weighted infant sleep products.

120. Trumka also took credit for Dreamland's retail partners halting sales of Dreamland's products in testimony before Congress in July of 2024, stating that "[t]hey stopped selling product categories like … weighted infant swaddles, when they learned of CPSC warnings for consumers not to use them."

121. On information and belief, Trumka made these posts with the help of other CPSC employees when making these posts, including but not limited to the CPSC Staff.

**G. Dreamland's Business is Devastated**

122. The loss of sales from the shadow ban engineered by Trumka has been devastating to Dreamland.

123. While the Company saw double-digit growth year-over-year since it was founded, Dreamland saw its sales drop by nearly 75% percent in the six months that followed the Trumka Letters.

124. As one example of the effect of Trumka's actions: one of Dreamland's retail partners was responsible for over $650,000 in sales of Dreamland's products in 2021, which increased to more than $6.5 million in sales in 2022, increased further to more than $10.2 million in sales in 2023, and in the first quarter of 2024 sold more than $3.2 million in Dreamland's products —a more than 50% increase over 2023— and was expected to sell an estimated $16.6 million in Dreamland's products by the end of 2024. But this merchant ceased sales of Dreamland's weighted infant sleep products within days of the Trumka Letters, and Dreamland sold less than $50,000 through this merchant in the following three months.

125. Not only did Trumka's actions cause Dreamland to lose sales, but his actions also caused the destruction of Dreamland's physical inventory. Because Trumka had recklessly—and incorrectly—branded Dreamland's products as unsafe and dangerous in correspondence on CPSC letterhead, some of Dreamland's retail partners took this language as an official finding and felt obligated to destroy Dreamland's inventory rather than returning these products, believing that contractual provisions that prevented them from transferring unsafe products had been triggered. Hundreds of thousands of dollars of Dreamland's products were destroyed as "unsafe," despite the CPSC's earlier vote that they did not even have data sufficient to regulate (never mind recall or ban) these products.

**H. Trumka's Actions Cause Widespread Confusion Among the Public**

126. As Trumka almost certainly expected and intended, the Trumka Letters and his other public statements led to widespread confusion about Dreamland's products, causing numerous incorrect reports that weighted infant sleep products such as Dreamland's had been recalled.

127. Dreamland received countless emails and social media messages asking

why its products had purportedly been recalled and seeking refunds based on this supposed recall. For example:

a. One purchaser contacted Dreamland's customer service shortly after placing an order, saying: "Hi, I literally just placed an order but would like to cancel. Didn't realize this product was recalled."

b. Another consumer messaged Dreamland stating "Hello, I was notified by a friend that there was a recall on products we have from you guys. How do we go about getting a refund for the products?"

c. Another consumer messaged Dreamland asking, "Are your weighted sleep sacks no longer 'recalled'? We used with our first and loved them but have seen and been told that they were recalled in 2023 for safety reasons."

d. Yet another asked: "I have two weighted sleep sacks I bought in 2023 that I am told were recalled… What do I do with the recall?"

e. Multiple customers also posted nearly identical refund requests on retailer websites, stating various of "I would like a refund for the recall on this product," or "This item has been recalled, I would like my money back."

128. This confusion was magnified when some of Dreamland's retail partners issued communications referencing the apparent CPSC guidance (*i.e.*, the Trumka Letters) but failed to clarify that no formal recall had been issued or that this guidance was the non-binding view of a single commissioner.

129. To this day, Dreamland has been forced to expend substantial funds combatting rumors and false statements that its products have been recalled and/or cannot legally be purchased or sold.

### I. The United States House of Representatives Committee on Small Business Opens an Investigation into Trumka's Conduct

130. On July 25, 2024, Representative Roger Williams, Chairman of the House Committee on Small Business (the "Committee"), informed CPSC Chairman Hoehn-Saric that the Committee had opened an investigation into Trumka for potential violations of the CPSA, stating "[t]he Committee is concerned that a single CPSC Commissioner is exerting undue pressure on entities and forcing them to improperly remove small business' products from their shelves to the detriment of those small businesses," and specifically citing the Trumka Letters.

## CLAIMS FOR RELIEF

### Count One
### Tortious Interference with Economic Relations (under Maryland law)

131. Dreamland incorporates by reference all preceding allegations as though fully set forth herein.

132. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under applicable state law.

133. Defendant, acting through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), intentionally and willfully engaged in conduct designed to interfere with Dreamland's business relationships. Specifically, Trumka and the CPSC Staff sent the Trumka letters on official CPSC letterhead to major retailers of Dreamland's products—including but not limited to Target, Walmart, Nordstrom, and Babylist—intending through veiled threats to pressure each of them to halt sales of Dreamland's weighted infant sleep products. These letters were accompanied by public statements and videos, including the April 26 Statement, all of which were disseminated in Trumka's official capacity and with the authority and imprimatur of the CPSC.

134. On April 22, 23, and 25, CPSC Staff (and, on April 22, Trumka) discussed Target's "official" response to Trumka's letter to Target, including the timing thereof. During these calls, Trumka and/or the CPSC Staff further increased

pressure on Target through implied or express threats. The CPSC Staff involved were at least Robin Lipp, Isabella Maxey, and Kaiwon Tresvant.

135. Upon information and belief, similar calls occurred with other recipients of the Trumka letters.

136. These actions were calculated to cause damage to Dreamland's lawful business. The Trumka Letters and related public statements by Trumka contained false, misleading, unsubstantiated, and alarming claims about the safety of Dreamland's products, despite the absence of any formal product safety determination, recall, or regulatory action. The communications were directed specifically to Dreamland's retail partners and were intended to influence those retailers' business decisions regarding Dreamland's products.

137. This conduct was undertaken with the unlawful purpose of causing economic harm to Dreamland by inducing retailers to terminate or suspend their commercial relationships with Dreamland and to remove Dreamland's products from sale.

138. These actions were taken without right or justifiable cause.

139. Trumka and the CPSC Staff acted with malice, *i.e.*, with intent to harm Dreamland or at minimum knowledge that Dreamland would be harmed and with conscious disregard for that harm.

140. Dreamland suffered damages as a result, including the loss of sales and revenue due to retailers halting sales of Dreamland's products; the loss of business opportunities and prospective contractual relationships; significant reputational harm and diminished goodwill in the marketplace; consequential economic losses such as unsold inventory disposal, employee layoffs, and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of business relationships.

141. These actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

**Count Two**
**Tortious Interference with Contract (under Maryland law)**

142. Dreamland incorporates by reference all preceding allegations as though fully set forth herein.

143. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under applicable state law.

144. At all relevant times, Dreamland had valid and enforceable contracts with multiple retail partners, including, but not limited to Target, Walmart, Nordstrom, Babylist, and Amazon, for the sale and distribution of Dreamland's weighted infant sleep products. These contracts governed the terms of sale, distribution, and ongoing business relationships between Dreamland and each retailer, and were in full force and effect during the period described herein.

145. Defendant, acting through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), had actual knowledge of Dreamland's contractual relationships with these retailers.

146. Trumka, acting in his official capacity and under color of CPSC authority, intentionally and knowingly induced Dreamland's retail partners to breach their contracts or otherwise render performance impossible. He did so by sending the Trumka Letters and making public statements that falsely or misleadingly asserted that Dreamland's products were unsafe, and by creating the appearance that continued sales of Dreamland's products would trigger regulatory scrutiny, thereby pressuring these retail partners into ceasing sales and removing Dreamland's products from their shelves or online marketplaces. These communications were intended to, and did, intimidate these retailers into discontinuing their contractual relations with Dreamland.

147. The CPSC Staff similarly interfered with Dreamland's contracts with retail partners as detailed above, including by following up on the Trumka letters with

intimidating telephone calls, including but not limited to as described in Paragraphs 131 and 132.

148. There was no justification or legal right for this conduct.

149. Trumka and the CPSC Staff acted with malice, *i.e.*, with intent to harm Dreamland or at minimum knowledge that Dreamland would be harmed and with conscious disregard for that harm.

150. As a result of Trumka's letters and Trumka's and the CPSC Staff's actions, Dreamland's retail partners—including Target, Walmart, Nordstrom, Babylist, Amazon, and others—ceased selling Dreamland's products, removed them from their shelves, destroyed Dreamland's products, and/or terminated or suspended their commercial relationships with Dreamland. These actions constituted breaches of the contracts between Dreamland and the retailers, and/or otherwise rendered contractual performance impossible.

151. Dreamland suffered damages as a result, including the immediate loss of sales and revenue due to retailers halting sales of Dreamland's products; the loss of business opportunities and prospective contractual relationships; significant reputational harm and diminished goodwill in the marketplace; consequential economic losses such as unsold inventory disposal, employee layoffs, and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of business relationships.

152. These actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

## Count Three
## Fraudulent Misrepresentation (under Maryland law)

153. Dreamland incorporates by reference all preceding allegations as though fully set forth herein.

154. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under

applicable state law.

155. Defendant, acting through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), made false and misleading representations in the Trumka Letters sent to Dreamland's retail partners, including but not limited to Target, Walmart, Nordstrom, and Babylist, and in other public statements described herein, including the April 26 Statement.

156. In particular, Trumka made the following false and misleading statements, as detailed above:

a. Stating that the CPSC, NIH, CDC, and AAP were "all in agreement when it comes to weighted infant sleep products: they pose serious threats to the lives of babies":
b. Stating that weighted infant sleep products such as Dreamland's were "unsafe";
c. Stating that weighted infant sleep products such as Dreamland's created a "risk of death to your baby," accompanied by an image of a swaddled infant with two dumbbells crisscrossed over the child's chest and superimposed with a general prohibition sign over the image;
d. Stating that Trumka was "aware of **multiple infant deaths** involving weighted infant sleep sacks" (emphasis in original);
e. Suggesting a causal link between weighted infant sleep products such as Dreamland's and Sudden Infant Death Syndrome (SIDS);
f. Stating that weighted infant sleep products such as Dreamland's posed "serious safety concerns" and that there was a "consensus among public health agencies, pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are not safe for infant sleep";
g. Stating that "multiple infant deaths have occurred in weighted infant

products" such as Dreamland's;

h. Stating that "I've sat with the parents of a child who died in one of these products" such as Dreamland's; and

i. Describing weighted infant sleep products such as Dreamland's as "hazard[ous]."

157. On information and belief, the CPSC Staff also made such or equivalent statements in the telephone calls to Target and other retailers, as described above.

158. With respect to the dumbbell, on information and belief, the CPSC Staff created the graphic image and the language in the post, knowing it would be publicly posted, and then assisted Trumka with making the public post.

159. These statements were made on official CPSC letterhead or from Trumka's official CPSC social media accounts, and in the context of Trumka's role as a federal official, thereby creating the appearance of government authority.

160. At the time these statements were made, Trumka and the CPSC Staff knew they were false and misleading, or at a minimum acted with reckless disregard for their truth or falsity. Trumka knew that no formal safety determination had been made by the CPSC or any other government authority regarding weighted infant sleep products such as Dreamland's, and that there was no data or regulatory finding substantiating any claims of product danger or association with infant deaths. Trumka's statements were not supported by any official investigation, technical review, or product recall, and he was aware that neither the CPSC nor any other federal agency had conducted independent research or made product safety determinations regarding Dreamland's products.

161. Trumka and the CPSC Staff made these false and misleading representations with the intent to mislead and intimidate Dreamland's retail partners and to induce them to stop selling Dreamland's products. The Trumka Letters and public statements were calculated to create the impression of imminent regulatory action or investigation if the retailers did not cease sales of weighted infant sleep

products such as Dreamland's, thereby threatening retailers to immediately discontinue their commercial relationships with Dreamland. The communications were designed to, and did, create the appearance of an urgent and authoritative warning, despite the absence of any regulatory basis for such claims.

162. Retailers reasonably relied on Trumka's representations as authoritative statements regarding product safety. Given the official appearance of the Trumka Letters, the demands for meetings unless retailers stopped sales of weighted infant sleep products such as Dreamland's, and the position of Trumka within the CPSC, retailers understood these statements to reflect the agency's position and acted accordingly. As a result, Dreamland's retail partners terminated their business relationships with Dreamland, removed Dreamland's products from their shelves or online stores, destroyed Dreamland's products, and ceased sales of Dreamland's weighted infant sleep products.

163. Dreamland suffered damages as a result, including the immediate loss of sales and revenue due to retailers halting sales of Dreamland's products; the loss of business opportunities and prospective contractual relationships; significant reputational harm and diminished goodwill in the marketplace; consequential economic losses such as unsold inventory disposal, employee layoffs, and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of business relationships.

164. Trumka and the CPSC's actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

## **Count Four**
## **Libel (under Maryland law)**

165. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

166. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under

applicable state law.

167. Defendant, through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), published written statements to third parties—specifically, Dreamland's retail partners—on official CPSC letterhead or through his official CPSC social media accounts, asserting that Dreamland's products were dangerous and posed a risk of death to infants.

168. In particular, Trumka made the following statements, as detailed above:

a. Stating that the CPSC, NIH, CDC, and AAP were "all in agreement when it comes to weighted infant sleep products: they pose serious threats to the lives of babies":

b. Stating that weighted infant sleep products such as Dreamland's were "unsafe";

c. Stating that weighted infant sleep products such as Dreamland's created a "risk of death to your baby," accompanied by an image of a swaddled infant with two dumbbells crisscrossed over the child's chest and superimposed with a general prohibition sign over the image;

d. Stating that Trumka was "aware of **multiple infant deaths** involving weighted infant sleep sacks" (emphasis in original);

e. Suggesting a causal link between weighted infant sleep products such as Dreamland's and Sudden Infant Death Syndrome (SIDS);

f. Stating that weighted infant sleep products such as Dreamland's posed "serious safety concerns" and that there was a "consensus among public health agencies, pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are not safe for infant sleep";

g. Stating that "multiple infant deaths have occurred in weighted infant products" such as Dreamland's; and

h. Describing weighted infant sleep products such as Dreamland's as "hazard[ous]."

169. On information and belief, the CPSC Staff also made such or equivalent statements in the telephone calls to Target and other retailers, as described above.

170. With respect to the dumbbell image, on information and belief, the CPSC Staff created the graphic image and the language in the post, knowing it would be publicly posted, and then assisted Trumka with making the public post.

171. These statements were false and misleading. No formal product safety determination has ever been made regarding Dreamland's products, the CPSC had not found weighted infant sleep products such as Dreamland's to be unsafe, nor had any regulatory action or recall been initiated, nor was there scientific data to support these claims.

172. Trumka and the CPSC Staff acted with knowledge of the falsity of these statements or with reckless disregard for their truth, and in violation of CPSA's disclosure requirements, which mandate accuracy, fairness, and procedural safeguards including prior notice to the manufacturer.

173. Trumka and the CPSC Staff also acted with malice, *i.e.*, with intent to harm Dreamland or at minimum knowledge that Dreamland would be harmed and with conscious disregard for that harm.

174. As a result of these defamatory statements, Dreamland's retail partners terminated their business relationships, removed Dreamland's products from their shelves or online stores, and ceased sales of Dreamland's weighted infant sleep products. Plaintiff suffered actual damages, including but not limited to lost sales and revenue from the removal of Dreamland's products from major retailers, loss of existing and prospective business relationships with retail partners, significant reputational harm, consequential economic losses, including costs associated with unsold inventory, layoffs, and business contraction, and ongoing and future economic harm resulting from the loss of goodwill and market position.

175. The CPSC's actions (including through Trumka and the CSPC Staff) did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

**Count Five**
**False Light (under Maryland law)**

176. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

177. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under applicable state law.

178. Defendant, through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), gave publicity to matters concerning Dreamland by sending the Trumka Letters to retailers on CPSC letterhead and amplifying those communications through public channels, including official statements and social media posts. These communications placed Dreamland before the public in a false light by associating its products with "serious threats to the lives of babies" and "multiple infant deaths," without any official product safety determination or substantiating data from the CPSC. Trumka also misleadingly stated "I've sat with the parents of a child who died in one of these products," while failing to disclose that the death of the infant in question was demonstrably not attributable to such products.

179. The false light in which Dreamland was placed would be highly offensive to a reasonable person, as the communications implied that Dreamland knowingly sold dangerous products and was callously indifferent to the safety of infants. These statements were made by Trumka in a manner calculated to alarm the public and Dreamland's business partners, and to create the impression of imminent regulatory or safety action, despite the absence of any such finding.

180. Trumka and the CPSC Staff acted with knowledge of or reckless disregard for the falsity of the publicized matter and the false light in which

Dreamland was placed. The Trumka Letters and associated statements, including the April 26 Statement, were made without sufficient factual basis and without compliance with the procedural and substantive safeguards mandated by the CPSA and its regulations.

181. Trumka and the CPSC Staff also acted with malice, *i.e.*, with intent to harm Dreamland or at minimum knowledge that Dreamland would be harmed and with conscious disregard for that harm.

182. Dreamland suffered damages as a result, including the immediate loss of sales and revenue due to retailers halting sales of Dreamland's products; the loss of business opportunities and prospective contractual relationships; significant reputational harm and diminished goodwill in the marketplace; consequential economic losses such as unsold inventory disposal, employee layoffs, and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of business relationships.

183. Trumka and the CPSC's actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

## Count Six
## Gross Negligence (under Maryland law)

184. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

185. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under applicable state law.

186. Defendant, through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), owed Dreamland a statutory duty of care arising from the CPSA, 15 U.S.C. § 2055(b), and its implementing regulations at 16 C.F.R. pt. 1101 and through CPSC Directive 1450.2. These provisions collectively establish a specific standard of conduct requiring that any public

statements regarding the safety of consumer products—particularly those that identify or implicate a manufacturer—must be accurate, not misleading, and made in accordance with mandatory procedural safeguards, including prior notice to the manufacturer and an opportunity to respond.

187. The CPSA and its regulations were enacted to protect a class of persons that includes manufacturers such as Dreamland. This is because these regulations, *inter alia*, codify Defendant's good-Samaritan duties (including towards third parties) stemming from Defendant's decision to protect the public from unsafe products and induce reliance by the public and third partes. These statutory and regulatory requirements are specifically intended to prevent reputational, economic, and business harm to manufacturers resulting from inaccurate or misleading public statements about their products. Dreamland is squarely within the class of entities the statute was designed to protect.

188. Defendant, through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), negligently made false and misleading statements about the safety of Dreamland's products in public statements, in the Trumka Letters, and in the changes to CPSC's Safe Sleep guidance on its website, without sufficient factual basis, supporting data, or compliance with the procedural and substantive safeguards mandated by the CPSA and its regulations, including requirements for accuracy, fairness, and prior notice to Dreamland.

189. Trumka and the CPSC Staff acted with malice, *i.e.*, with intent to harm Dreamland or at minimum knowledge that Dreamland would be harmed and with conscious disregard for that harm.

190. Defendant's violation of these statutory and regulatory requirements constitutes gross negligence and gross negligence *per se*, as the conduct not only breached the applicable standard of care but did so in a manner that demonstrated a wanton and reckless disregard for Dreamland's rights and the foreseeable consequences of such conduct.

191. Defendant's grossly negligent conduct was the direct and proximate cause of Dreamland's injuries. It was entirely foreseeable—and in fact intended—that Dreamland's retail partners and the public would rely on Trumka's statements, resulting in the removal of Dreamland's products from retail channels, the termination of business relationships, widespread public confusion regarding the safety and regulatory status of Dreamland's products, and substantial economic and reputational harm.

192. Dreamland suffered damages as a result, including the immediate loss of sales and revenue due to retailers halting sales of Dreamland's products; the loss of business opportunities and prospective contractual relationships; significant reputational harm and diminished goodwill in the marketplace; consequential economic losses such as unsold inventory disposal, employee layoffs, and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of business relationships.

193. Trumka and the CPSC's actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

## Count Seven
## Injurious Falsehood (under Maryland law)

194. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

195. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, the United States is liable in tort where a private party would be liable under applicable state law.

196. Defendant, through the CPSC (including the CPSC Staff) and Trumka (acting as Commissioner and the CPSC itself), made public statements disparaging Dreamland's products and business by sending the Trumka Letters to retailers on CPSC letterhead and amplifying those communications through public channels, including official statements and social media posts.

197. These statements and communications were calculated to prevent others from purchasing Dreamland's products and otherwise doing business with Dreamland, and to interfere with Dreamland's relations with its business partners, customers, and the public.

198. These statements were objectively false as demonstrated, *inter alia*, by the single study on point, which found "no adverse events" from the use of weighted infant sleep products.

199. Trumka and the CPSC Staff knew they were false or at a minimum acted with reckless disregard for their falsity.

200. Trumka and the CPSC Staff also acted with malice, *i.e.*, with intent to harm Dreamland for its own sake (*i.e.*, portraying Trumka as a savior of babies and a "consumer advocate" champion, and portraying the CPSC Staff as Trumka's deputies) or at minimum with knowledge that Dreamland would be harmed and with conscious disregard for risk of that harm.

201. Trumka and the CPSC Staff acted in bad faith, and no privilege excused this conduct.

202. These statements and communications played a material and substantial role in inducing Dreamland's business partners, customers, and the public to terminate business relationships with Dreamland and/or deciding not to transact with Dreamland.

203. These statements were the direct and proximate cause of Dreamland's injuries, which were entirely foreseeable—and in fact intended.

204. Dreamland suffered special damages as a result, including pecuniary losses in the form of the immediate loss of sales and revenue due to retailers halting sales of Dreamland's products and, in some instances, destroying inventory; the loss of business opportunities and prospective contractual relationships; expenses linked to employee layoffs and reduced business operations; and ongoing and future economic harm stemming from the erosion of market position and disruption of

business relationships.

205. Trumka and the CPSC's actions did not constitute agency action, as defined in 5 U.S.C. § 551 (13).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

a. Damages in an amount to be determined at trial, but no less than $90,000,000;
b. Post-judgment interest as allowed by law;
c. An award for all reasonable fees and costs incurred herein and that Plaintiff may be entitled to under law, including the Equal Access to Justice Act, 28 U.S.C. § 2412(b); and
d. Such other relief as this Court deems just and proper.

Dated: September 8, 2026

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: /s/

Dan G. Boyle (State Bar No. 332518)
dboyle@bsfllp.com
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 213-629-9040

Matthew L. Schwartz (*pro hac vice*)
mlschwartz@bsfllp.com
55 Hudson Yards, 20th Fl.
New York, NY 10001
Telephone: (212) 446-2300

*Counsel for Dreamland Baby Co.*

# EXHIBIT A

UNITED STATES
CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814

COMMISSIONER RICH TRUMKA JR.

**April 15, 2024**

**BY EMAIL AND CERTIFIED MAIL**
Mr. Brian Cornell
Chair and CEO
Target Corporation
1000 Nicollet Mall
Minneapolis, MN 55403

Dear Mr. Cornell,

I write to inform you of a consensus among public health agencies, pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks, swaddles, and blankets are not safe for infant sleep. I am aware of **multiple infant deaths** involving weighted infant sleep sacks. Currently, Target has listed for sale on its website a number of weighted infant sleep products.[1]

Three federal public health agencies[2] and the American Academy of Pediatrics (AAP),[3] an organization representing 67,000 pediatricians, have issued warnings recommending against the use of weighted infant blankets and wearables. CPSC warns: "**Don't** use weighted blankets

[1] "Weighted Sleep Sacks for Babies" product search, *Target* (last accessed Apr. 12, 2024) (available at: https://www.target.com/s?searchTerm=weighted+sleep+sacks+for+babies&category=0%7CAll%7Cmatchallpartial%7Call+categories&tref=typeahead%7Cterm%7C0%7Cweighted+sleep+sacks+for+babies%7Cweighted+sleep+sacks+for+babies%7C%7C%7Cservice%7C%7C%7C%7C%7Cnormalisation%7Ecategory_v3&searchTermRaw=weighted+sleep+sack).

[2] "Safe Sleep – Cribs and Infant Products," *CPSC* (last accessed Jan. 22, 2024) (available at: https://www.cpsc.gov/SafeSleep); "Helping Babies Sleep Safely," *CDC* (last accessed Jan. 22, 2024) (available at: https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/); "Safe Sleep Environment for Baby," *NIH* (last accessed Jan. 22, 2024) (available at: https://safetosleep.nichd.nih.gov/reduce-risk/safe-sleep-environment).

[3] Letter from Sandy L. Chung, MD and President of AAP to CPSC and ASTM International F15 Committee Chair Donald Mays (June 15, 2023) (available at: https://www.documentcloud.org/documents/23849624-aap-letter-61523).

or weighted swaddles" for your babies.[4] The National Institutes of Health (NIH) says that these weighted products "can pose dangers for babies." And the Centers for Disease Control and Prevention (CDC) states that "[w]eighted products such as weighted sleepers, weighted swaddles, weighted sleep sacks, and weighted blankets are not safe for infants." [5]

Dr. Rachel Moon, of the University of Virginia, the nation's leading expert on safe infant sleep, and co-chair of AAP's task force on Sudden Infant Death Syndrome (SIDS) explained to the Washington Post: "When babies are first born, their rib cage is not rigid, and so it doesn't take a lot of pressure to press on it and create obstruction there. It makes it harder for them to breathe, it makes it harder for their heart to beat properly if there's pressure on there."[6]

In June 2023, AAP also explained the risk of brain damage posed by weighted infant sleep products:

> These products are associated with concerning reductions in oxygen saturation levels in infants. This means there is evidence that the use of weight sleep products on infants can lead to lower oxygen levels, which if sustained, may be harmful to the developing infant's brain.[7]

Considering these serious safety concerns, I would like to speak with a representative of your company to discuss a simple question: does Target really want to continue selling these products to its consumers? Your consumers place a great deal of trust in your hands.

Please contact my Executive Assistant, Isabella Maxey, IMaxey@cpsc.gov so that we can schedule a telephone call at your earliest convenience. I look forward to speaking soon.

Sincerely,

Richard L. Trumka Jr.
Commissioner
U.S. Consumer Product Safety Commission

---

[4] "Safe Sleep – Cribs and Infant Products," *CPSC* (last accessed Jan. 18, 2024) (available at: https://www.cpsc.gov/SafeSleep#:%7E:text=Don%27t%20use%20weighted%20blankets,such%20as%20any%20inclined%20product).

[5] "Safe Sleep Environment for Baby," *NIH* (last accessed Jan. 18, 2024) (available at: https://safetosleep nichd.nih.gov/reduce-risk/safe-sleep-environment); "Helping Babies Sleep Safely," *CDC* (last accessed Jan. 18, 2024) (available at: https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/).

[6] Lauren Kirchner, *Weighted blankets are dangerous for babies, doctors warn*, WASH. POST, Jan. 22, 2024 https://www.washingtonpost.com/wellness/2024/01/22/weighted-baby-blankets-unsafe/.

[7] *Id.*